IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JaM CELLARS, INC., | No. 17-01133-CRB |
| Plaintiff, | **ORDER DENYING MOTION TO STRIKE** |
| v. | |
| VINTAGE WINE ESTATES, INC., | |
| Defendant. | |

Plaintiff JaM Cellars, Inc. ("JaM"), owner of the BUTTER mark and maker of BUTTER chardonnay, brought suit against Defendant Vintage Wine Estates, Inc. ("Vintage"), fledgling developer of "BUTTER BOMB" and "BUTTER KNIFE" chardonnays, over concerns that its loyal customers will mistakenly purchase Vintage's offerings, only to declare, "I Can't Believe It's Not BUTTER!®" See Compl. (dkt. 1). Vintage moves to strike two causes of action pursuant to California's anti-SLAPP statute, arguing that JaM has sued it for protected activity, and that JaM cannot show a probability of prevailing on the merits. See Mot. (dkt. 13). As the Court indicated from the bench, it hereby DENIES the motion and will allow the case to ferment further.

//

//

## I. BACKGROUND

JaM owns the trademark "BUTTER," and uses it on its California chardonnay table wine. Compl. ¶ 5.[1] JaM has owned the trademark BUTTER for wine since 2011, with constructive use rights dating back to 2010; the registration is incontestable. Id. ¶ 8. BUTTER chardonnay is available in forty-eight states. Id. ¶ 10. JaM has sold over six million bottles of BUTTER since 2010, over three million of which were in 2016 alone. Id. That might be enough BUTTER to make Paula Deen blush. But see Paula Deen, Paula's Fried Butter Balls, Food Network, www.foodnetwork.com/recipes/paula-deen/paulas-fried-butter-balls-recipe-1946687 (last viewed May 23, 2017). Sales of JaM's BUTTER chardonnay have exceeded fifty three million dollars since 2010, twenty-six million dollars of which were in 2016 alone. Compl. ¶ 11. JaM's BUTTER wine was the #2 selling chardonnay in the $15–20 range in the United States. Id. ¶ 13. JaM has spent over two million dollars marketing its BUTTER chardonnay since 2010, and was the primary sponsor of the BottleRock Napa Valley music festival in 2015 and 2016. Id. ¶¶ 14–15.

Vintage also makes and sells table wines, and, among other things, creates private labels for chain retailers. Id. ¶ 6.[2] In 2016, Vintage and national grocery retailer, Kroger, developed two wine brands, BUTTER BOMB and BUTTER KNIFE, as private labels for Kroger. Id. ¶ 19. BUTTER BOMB and BUTTER KNIFE are California chardonnays. Id. According to the complaint, Vintage and Kroger intend to price the wines lower than JaM's BUTTER wine, to trade on the goodwill of JaM's BUTTER mark, and even to place the wines "directly adjacent to JaM's BUTTER wine" on shelves. Id. ¶¶ 19, 30. In June 2016,

---

[1] The Court notes that "buttery" is an adjective frequently used in describing a particular type of chardonnay, see Madeline Puckette, Chardonnay Wine Guide: Something for Everyone, Wine Folly (May 16, 2013), http://winefolly.com/review/chardonnay-wine-guide/ ("If you like the idea of butter in your glass, you'll love the classic style of oak-aged Chardonnay wine."); see also Letourneau Decl. (dkt. 13-1) Ex. B at 5 (Wine Spectator glossary defining "buttery"), and that "butter" is a noun connoting unhealthful decadence, see, e.g., Mateo Messina, Butter (The Greatest Gift in Life), Shazam, http://www.shazam.com/track/67811062/butter-the-greatest-gift-in-life (last visited May 17, 2017) ("I want to put it on both sides, then realize: need more than a pat, as a matter of fact. Gonna melt it down. And serve it up. Then get all crazy! I can't get enough. 'Cause you can pass it, cut it, add it, love it, drown your corn and sorrows in it.") (lyrics approximated based on audio clip).

[2] A private label is "a brand that is created exclusively for a single retailer and that can be purchased only at that retailer's premises." Id.

Vintage filed applications to register BUTTER BOMB and BUTTERKNIFE WINES as trademarks. Id. ¶¶ 20–23. JaM's counsel notified Vintage that it objected to Vintage using the term BUTTER as part of its trademarks, and received no response from Vintage. Id. ¶ 24. In December 2016 and January 2017, Vintage applied for and received Federal Certificate of Label Approvals ("COLAs") for BUTTER BOMB and BUTTER KNIFE[3] wines, despite JaM's objections. Id. ¶¶ 25–28.

JaM, immune to Vintage's wine charms, brought suit in March 2017, accusing Vintage of (1) trademark infringement pursuant to 15 U.S.C. § 1114, (2) false designation of origin pursuant to 15 U.S.C. § 1125, (3) common law trademark infringement, (4) unfair competition pursuant to California Business and Professions Code § 17200, (5) unjust enrichment, and (6) false or misleading statements pursuant to California Business and Professions Code § 17500. See Compl. ¶¶ 43–66. Uncorked and decanted, the complaint alleges that Vintage "used the BUTTER BOMB and BUTTER KNIFE marks in commerce or such use is imminent" as "confirmed by Kroger," and that the Vintage wines are "likely to confuse consumers into believing that its wine is affiliated with, connected to, or sponsored by JaM and its popular BUTTER wine." Id. ¶¶ 32, 36. JaM further asserts that the marks are "similar in sight and sound," both starting with the dominant term "BUTTER," using the same yellow and black colors, and appearing on the same goods in the same channels of trade. Id.

Vintage, urging that JaM is trying to cut its wine legs out from under it, brings a motion to strike the two unfair competition law ("UCL") claims in the complaint (those brought pursuant to California Business and Professions Code sections 17200 and 17500), as a Strategic Lawsuit Against Public Participation ("SLAPP"). See Mot.

//

//

---

[3] The COLA application differed from the BUTTERKNIFE WINES trademark by dropping the word "wines" and adding a space between "butter" and "knife," a distinction that JaM contends "deliberately emphasizes the BUTTER portion of the mark." Id. ¶ 29.

3

## II. LEGAL STANDARD

California's anti-SLAPP statute provides that any "cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue" is "subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." Cal. Code Civ. Proc. § 425.16(b)(1). The statute facilitates "the early dismissal of unmeritorious claims filed to interfere with the valid exercise of the constitutional rights of freedom of speech and petition." Club Members for an Honest Election v. Sierra Club, 45 Cal. 4th 309 (2008). Plaintiffs who find their claims stricken pursuant to the statute describe it as spicy, with a harsh mouthfeel and a bitter finish.

## III. DISCUSSION

Analysis of a motion to strike pursuant to the anti-SLAPP statute consists of two steps. "The defendant bears the initial burden to show that the statute applies because the lawsuit arises"—or in this case, the challenged causes of action arise—"from defendant's act in furtherance of its right of petition or free speech." See Doe v. Gangland Prods., Inc., 730 F.3d 946, 953 (9th Cir. 2013).[4] If the defendant makes that showing, the court then considers whether the plaintiff has demonstrated "a reasonable probability" of prevailing on the merits of his claims. In re NCAA Student-Athlete Name & Likeness Licensing Litig., 724 F.3d 1268, 1273 (9th Cir. 2013) (quoting Batzel v. Smith, 333 F.3d 1018, 1024 (9th Cir. 2003)). Vintage argues that (A) the two UCL claims arise from Vintage's protected activity of filing

---

[4] Such acts include:

> (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest.

Cal. Code. Civ. Proc. § 425.16(e).

4

trademark and COLA applications, and (B) although it seeks to play the role of wine stopper, JaM cannot demonstrate a probability that it will prevail on those UCL claims.

### A. Protected Activity

The first step of the anti-SLAPP analysis, determining whether the relevant claims implicate a protected activity, is a matter of interpretation. "A defendant in an ordinary private dispute cannot take advantage of the anti-SLAPP statute simply because the complaint contains some references to . . . petitioning activity by the defendant." Sansoe v. Ford Motor Co., 668 Fed. Appx. 718, 719 (9th Cir. 2016) (quoting People ex rel. fire Ins. Exch. v. Anapol, 211 Cal. App. 4th 809 (2012)). "[T]he mere fact an action was filed after protected activity took place does not mean it arose from that activity." City of Cotati v. Cashman, 29 Cal. 4th 69, 76–77 (2002). On the other hand, "a plaintiff cannot frustrate the purposes of the SLAPP statute through . . . combining allegations of protected and nonprotected activity under the label of one 'cause of action.'" Martinez v. Metabolife Intern., Inc., 113 Cal. App. 4th 181, 188 (2003) (quoting Fox Searchlight Pictures Inc. v. Paladino, 89 Cal. App. 4th 294, 308 (2001)). The Court must trust its palate to isolate the dominant flavors of the claim. "[I]t is the principal thrust or gravamen of the plaintiff's cause of action that determines whether the anti-SLAPP statute applies." Martinez, 113 Cal. App. 4th at 188 (emphasis in original; citing to City of Cotati, 29 Cal. 4th at 79).

JaM's claim for violation of section 17200 incorporates all of the prior allegations in the complaint, alleges that such conduct by Vintage is "unfair, unlawful, and fraudulent," and goes on to allege that "JaM has suffered direct injury and damage because sales have been and will be diverted to Vintage. . . because consumers mistakenly believe that Vintage's wine originates with JaM or is a 'bargain' version of JaM's wine." Compl. ¶¶ 59–61. Its claim for violation of section 17500 incorporates all of the prior allegations in the complaint and alleges that such conduct by Vintage constitutes "dissemination and making of untrue or misleading statements." Id. ¶¶ 65–66. Vintage argues in the motion that the two UCL claims thus challenge Vintage's filing of a trademark application with the USPTO and its COLA applications, and, further, that "[t]he gravamen of, and tactical reason for, the complaint is

apparent—to punish [Vintage's] refusal to bow to [JaM's] pressure and abandon its Trademark Applications and COLAs." Id. at 6–7.

Vintage cites to Mindys Cosmetics, Inc. v. Dakar, 611 F.3d 590, 594, 598 (9th Cir. 2010) for the undisputed proposition that "the act of filing a trademark application with the USPTO . . . is protected by the anti-SLAPP statute as a writing made before an executive or other official proceeding." Mot. at 6 (citing Mindys Cosmetics, 611 F.3d at 598); see also Cal. Code Civ. Proc. § 425.16(e) (protecting "any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law"). But Vintage also relies on Mindys Cosmetics in asserting that Vintage's trademark applications "form[] the primary basis for [JaM's]" UCL claims, Mot. at 6 (quoting Mindys Cosmetics, 611 F.3d at 598), and that proposition is more cloudy. Mindys Cosmetics involves a family business gone bad, in which a husband brought suit against the business's lawyer for registering trademarks in his wife's name. See Mindys Cosmetics, 611 F.3d at 594. The business's lawyer filed an anti-SLAPP motion, and the Ninth Circuit had little trouble concluding that the only act complained of was the lawyer's "formal communication to the USPTO seeking official action in a process governed by statute." See id. at 596, 598. There was no issue in that case of the lawyer using the trademark.

Here, in contrast, use is a key component of plaintiff's overall bouquet. Unlike in Mindys Cosmetics, JaM's allegations describe not only a lawyer's act of filing a trademark registration, but a defendant's alleged effort "to trade on the goodwill of JaM's BUTTER wine," Compl. ¶ 19, to "use" the contested marks, id. ¶¶ 24, 26, 27, to market the competing wines "directly adjacent to JaM's BUTTER wine," and to "use[] the [competing wines] in commerce," id. at 32. The complaint alleges: "The whole point of Vintage's conduct is to confuse customers . . . and to compete unfairly with JaM." Id. ¶ 31. The Court is persuaded that the principal thrust of the allegations here is not the protected activity of filing trademark and COLA applications but the unprotected activity of using and infringing on JaM's BUTTER mark. See Opp'n (dkt. 15) at 4–5 (arguing that Vintage's protected activities were

6

mere prelude to the real problem—"simply part of a gathering storm"). Many infringement cases will mention a defendant's trademark application process, and they cannot all run afoul of the anti-SLAPP statute. Nonetheless, the Court hesitates to dismiss the robust allegations here about the trademark and COLA applications, see Compl. ¶¶ 59, 65 (incorporating all previous allegations), as entirely "incidental" to the UCL claims, see Mindys Cosmetics, 611 F.3d at 598.

A recent California Supreme Court case counsels a more full-bodied means of analyzing JaM's UCL claims. In Baral v. Schnitt, 1 Cal. 5th 376, 392–93 (2016), the court examined what courts are to do in the case of a blend, where a single cause of action includes allegations of both protected and unprotected activity. The court held that for such "mixed" claims, a "plaintiff is required to establish a probability of prevailing on any claim for relief based on allegations of protected activity." Id. at 395. Thus, courts are to "disregard[]" the allegations based on unprotected activity (here, the infringing use) and proceed to the second step of the anti-SLAPP analysis if there are allegations based on protected activity (here, the trademark and COLA applications). Id. at 396. To avoid a judicial hangover, therefore, the Court proceeds to the second step of the anti-SLAPP analysis, where Vintage's arguments do not pair well with further inquiry.

### B. Probability that the Plaintiff will Prevail

At the second step of the anti-SLAPP analysis, the burden shifts to the plaintiff to establish that it has "a reasonable probability" of prevailing on the merits of its claims. In re NCAA Student-Athlete Name & Likeness Licensing Litig., 724 F.3d at 1273. Vintage argues that JaM cannot prevail on its UCL claims because (1) it has not been injured and (2) its mark is weak. This argument about BUTTER's owner is spread too thin.

#### 1. Injury

Vintage argues first that JaM fails to allege injury. Mot. at 8. A UCL plaintiff must allege that it has suffered injury in fact, and not just possible future injury. See Cal. Bus. & Prof. Code § 17204 ("Actions for relief pursuant to this chapter shall be prosecuted by . . . a person who has suffered injury in fact and has lost money or property as a result of the unfair

7

competition."). Vintage is correct that the allegations in the complaint largely anticipate consumers' future confusion. See, e.g., Compl. ¶ 36 ("is likely to confuse consumers"); id. ¶ 37 ("will unjustly increase the profitability of these brands"); id. ¶ 38 ("consumers will purchase"). However, Vintage ignores the soft but undeniable undertones of the complaint that do allege injury, including the allegations in the UCL claim itself. See id. ¶ 46 ("JaM has been and will be injured by Vintage's use and promotion of its trademarks"); id. ¶ 57 ("Vintage's sale of wine bearing the BUTTER BOMB and BUTTER KNIFE mark infringes JaM's common law BUTTER trademark"); id. ¶ 61 ("JaM has suffered direct injury and damage because sales have been and will be diverted to Vintage . . . because consumers mistakenly believe . . . . These wrongful acts have proximately caused and/or will continue to cause JaM substantial injury, including confusion in the marketplace, wrongful association, injury to its reputation, direct economic loss, and diminution in value of its trademark.") (emphasis added).

  Vintage also argues that there is no evidence of actual injury since JaM filed the complaint. Mot. at 9. It is not clear what would obligate JaM to point to such evidence, but evidence that JaM is currently being injured has indeed bubbled to the surface. In a declaration submitted in support of the motion, Pat Roney, the President of Vintage, declared that "It was not until a few weeks after the Complaint was filed that product bearing the Marks was shipped to Kroger." Roney Decl. (dkt. 13-2) ¶ 4; see also Opp'n at 4–5 ("[b]y the time the Complaint was filed in March 2017[,] [JaM] had received confirmation from Kroger that the wine had been bottled and shipped, sales were imminent, the wine would be offered as a lower-priced version of BUTTER and it would be merchandised adjacent to [JaM's] wine in Kroger stores."). Although Roney declared that at the time of his declaration, "no product bearing the Marks has been sold or advertised to consumers or encountered by consumers in the ordinary course of trade," he added: "The product will not be on the Kroger shelves for at least a few more weeks." Roney Decl. ¶ 4. Roney executed the declaration on March 28, 2017. See Roney Decl. at 2. More than "a few weeks" passed before the motion hearing, and indeed, at the motion hearing, JaM's counsel represented without contradiction

8

that Vintage's products are on the shelves. As the Court explained at the motion hearing, it would not be a useful exercise to give JaM leave to amend the complaint to add such allegations; moreover, the current allegations of injury are palatable.[5]

### 2. Strength of the Mark

Finally, the dregs of Vintage's motion. Vintage contends that JaM cannot prevail on its UCL claims because the BUTTER mark is weak and "entitled to a very narrow scope of protection." Mot. at 10–13. While Vintage concedes that JaM's BUTTER trademark is incontestable, it asserts that the mark is "often used by other parties." Id. at 10 (quoting Exxon Corp. v. Texas Motor Exchange of Houston, 628 F.2d 500, 504 (5th Cir. 1980)). Vintage asks the Court to take judicial notice of the "large number of BUTTER-formative marks used on wine." Id. at 10–12 (listing nine products with trademark registrations that use the word "butter," including BUTTER FACE, BREAD & BUTTER, BUTTERBALL, etc., and asserting that there are 383 COLA search results for the word "butter"); RJN Exs. E, F. It then contends that, "[i]n light of the wide-spread use of BUTTER-formative marks in connection with wine, [Vintage's] Marks are distinct from [JaM's] BUTTER Mark and consumers are accustom[ed] to differentiating the source of" wines with "butter" in the name. Mot. at 13. While this contention might appear smooth and creamy, the Court does not swallow it.

As an initial matter, JaM objects to Vintage's list of other products with BUTTER-related trademarks and BUTTER-related COLA entries as both hearsay and not the proper subject of judicial notice. Opp'n at 9–10. But the real problem with the list is that it is a generous pour of misdirection. That a mark is registered does not establish how widely used it is; for example, who is to say that consumers ever actually encounter BUTTERKISSED wine? See Olde Tyme Foods, Inc. v. Roundy's, Inc., 961 F.2d 200, 204 (Fed. Cir. 1992) ("As to strength of a mark, however, [third party] registration evidence may not be given any weight.") (emphasis in original); Charles Schwab & Co., Inc. v. Hibernia Bank, 665 F. Supp.

---

[5] Vintage seemed to concur with this approach at the motion hearing, shifting its argument to emphasize that even if JaM could "clean up" its complaint to add allegations of use, JaM had nonetheless failed to adequately allege likelihood of confusion.

9

800, 806 & n.7 (N.D. Cal. 1987) (rejecting trademark search that disclosed over 40 current or past registrations as "not proof of third party uses.") (emphasis in original); 2 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 11:89 (4th ed. 2013) ("The mere citation of third party registrations is not proof of third party uses for the purpose of showing . . . relative weakness. Third party registrations are not evidence of use 'so as to have conditioned the mind of prospective purchasers.'") (emphasis in original). The list is therefore not evidence of "the wide use and registration of BUTTER as part of composite trademarks for wine," as Vintage claims. See Mot. at 10. Nor does Vintage's counsel attest to any personal knowledge of the mark's use. See Letourneau Decl.[6]

The other big, bold problem with Vintage's argument about the strength of the BUTTER mark is that the strength of the mark is just one of the factors that determines the merits of a likelihood of confusion claim. Under AMF Inc. v. Sleekcraft Boats, courts analyzing likelihood of confusion claims (upon which these UCL claims are premised) must churn through an eight factor test: (1) strength of the mark; (2) proximity of the goods sold; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by purchasers; (7) defendant's intent in selecting its mark; and (8) likelihood of expansion of the product lines. See 599 F.2d 341, 348–49 (9th Cir. 1979). Vintage, in only challenging one of these factors, leaves the other seven factors to die on the vine.

As for JaM, it has met its minimal burden of establishing a probability of prevailing. The Ninth Circuit has explained that in the context of an anti-SLAPP motion, "'probability' is a low bar." Roberts v. McAfee, Inc., 660 F.3d 1156, 1163 (9th Cir. 2011). It continued: "[T]he plaintiff must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." Id. (quoting Manufactured Home Cmties., Inc. v.

---

[6] Indeed, in its reply brief, Vintage retreats, asserting that "[t]he purpose of the evidence was not to show use of such labels or marks. The purpose was to show that the word 'butter' or 'buttery' is a common idea in connection with Chardonnay." Reply (dkt. 16). Vintage thus concedes that it has not done anything to undermine JaM's assertions regarding use of the mark.

10

1  Cnty. of San Diego, 655 F.3d 1171, 1176–77 (9th Cir. 2011)). Although "the court does not
2  weigh the credibility or comparative probative strength of competing evidence, it should
3  grant the motion if, as a matter of law, the defendant's evidence supporting the motion
4  defeats the plaintiff's attempt to establish evidentiary support for the claim." Id. In Mindys
5  Cosmetics, the court explained that a plaintiff need only establish "minimal merit," and can
6  do so by "stat[ing] and substantiat[ing] a legally sufficient claim." 611 F.3d at 598–99.

7      Vintage argues that JaM has not met this minimal burden because JaM has not
8  provided even a hint of evidence in support of its claims. Reply at 5. Vintage cites to Baral
9  for its description of the second step of the anti-SLAPP analysis as "a summary-judgment-
10 like procedure." Id. (quoting Baral, 1 Cal. 5th at 384). Again, that is misdirection. Baral did
11 not mean that plaintiffs challenged in anti-SLAPP motions must collect a cellar's worth of
12 evidence. To the contrary, the court followed the "summary-judgment-like" sentence with:
13 "The court does not weigh evidence or resolve conflicting factual claims." Baral, 1 Cal. 5th
14 at 384. The inquiry is summary-judgment-like because courts are to "accept[] the plaintiff's
15 evidence as true, and evaluate[] the defendant's showing only to determine if it defeats the
16 plaintiff's claim as a matter of law." Id. at 384–85. Surely this practice reflects the very
17 early juncture at which the court is evaluating the strength of the plaintiff's case—the record
18 is unripened.

19     In its opposition brief, JaM made a prima facie case, based on the Sleekcraft factors
20 and drawn from the allegations in the complaint, as to ownership of the mark, priority, the
21 strength of the mark, the similarity of the goods and the marks, the marketing channels, the
22 type of good, and even intent. See Opp'n at 7–12. Vintage does not dispute that JaM owns
23 the BUTTER mark, that the mark is incontestable, or that the mark has acquired
24 distinctiveness. See Reply at 5. While Vintage is correct that JaM filed no declarations in
25 opposing the motion, see id., the evidence that Vintage provided reflects that (1) Vintage
26 submitted trademark and COLA applications for its BUTTER BOMB and BUTTER KNIFE
27 wines, see Romey Decl. ¶ 3, (2) Vintage has shipped BUTTER BOMB and BUTTER KNIFE
28 wines to Kroger, id. ¶ 4, (3) JaM contested Vintage's marks before the United States Patent

11

and Trademark Office based on JaM's BUTTER mark, RJN Ex. A, (4) JaM owns COLAs for BUTTER, RJN Ex. E, and (5) counsel for JaM warned Vintage that Vintage's marks "would lead to consumer confusion," Letourneau Decl. Ex. A. If the trier of fact accepts JaM's prima facie case, it would demonstrate that Vintage adopted confusingly similar marks to JaM's established BUTTER mark, and then sought to sell similar products, bearing the similar marks, at some of the same stores, all of which is likely to confuse customers.

The Court need not decide at this point whether JaM will ultimately prevail. Perhaps wine consumers have been so slathered with "butter" that a couple more pats will not hurt. Cf. Maggie Fox, A Little Butter Won't Kill You, Study Finds, NBC News (June 29, 2016, 5:48 P.M.), www.nbcnews.com/health/health-news/little-butter-won-t-kill-you-study-finds-n601271. For now, however, JaM has met its burden, and thus crushes Vintage's motion.[7]

## IV. CONCLUSION

For the foregoing reasons, the Court sends this motion to the spit bucket.

**IT IS SO ORDERED.**

Dated: June 12, 2017

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE

---

[7] Two additional issues warrant a light and crisp discussion.

First, Vintage argues that "the proper forum for determining whether the parties' various trademarks are confusingly similar is the [Trademark Trial and Appeal Board]" and that "[o]nce the Court dismisses this litigation, the TTAB actions can proceed." Mot. at 14. However, the motion only pertains to two claims, and so could not result in dismissal of the litigation. Moreover, the Ninth Circuit has held that it would be an abuse of discretion to decline to hear a case and remand to TTAB where there is a potential infringement claim. See Rhoades v. Avon Prods., Inc., 504 F.3d 1151, 1165 (9th Cir. 2007).

Second, both sides request fees in connection with the motion. See Mot. at 14 (citing Cal. Code of Civ. Proc. § 425.16(c)(1) for the proposition that defendant who prevails on anti-SLAPP motion is entitled to fees); Opp'n at 14 (citing same section for the proposition that plaintiff is entitled to fees if a court finds motion frivolous or intended only to cause delay). The Court DENIES both parties' requests.